**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: CALIFORNIA PIZZA KITCHEN DATA BREACH LITIGATION, | No. 23-55288 |
| _____ | D.C. Nos. 8:21-cv-01928- DOC-KES 2:21-cv-09578- DOC-KES |
| AVIVA KIRSTEN, | |
| *Plaintiff-Appellant*, | |
| KANSAS GILLEO, | OPINION |
| *Plaintiff-Appellee*, | |
| JEREMY PITTMAN, individually and on behalf of all others similarly situated, | |
| *Plaintiff-Appellant*, | |
| SYDNEY RUSEN; ESTEBAN MORALES; DOUG WALLACE; BRETT RIGAS; EVENCIO DIAZ, individually and on behalf of all others similarly situated, | |

*Plaintiffs-Appellees*,

v.

CALIFORNIA PIZZA KITCHEN,
INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted June 3, 2024
Pasadena, California

Filed February 24, 2025

Before: Richard R. Clifton, Daniel P. Collins, and Kenneth
K. Lee, Circuit Judges.

Opinion by Judge Lee;
Partial Concurrence and Partial Dissent by Judge Collins

# SUMMARY[*]

## Class Settlement / Attorneys' Fees

The panel affirmed the district court's approval of a class settlement, reversed the attorneys' fee award, and remanded in a class action brought by California Pizza Kitchen, Inc. (CPK) employees whose personal information was compromised by a cyberattack.

One group of plaintiffs' lawyers struck a settlement with CPK. The monetary value of the class's claims were (at most) around $950,000, yet the attorneys sought $800,000 in fees. The district court approved the settlement.

The panel held that district courts may approve claims-made settlements—even those that raise indicia of collusion—so long as they adhere to procedural requirements and find the settlement "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e). Although the district court's preliminary and final approval orders were sparse and memorialized little of the district court's rationale, the panel did not remand because the panel could reasonably infer the district court's rationale from the record, which was unusually extensive. The panel held that the district court properly applied the *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011), heightened standard to review the settlement for collusion. The panel concluded that upon a review of the record, the district court neither procedurally erred nor abused its discretion in finding the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

settlement substantively acceptable.   The panel thus
affirmed the approval of the class settlement.

The panel reversed the fee award because the district
court did not assess the actual value of the settlement and
compare it to the fees requested.   The panel remanded for the
district court to determine the settlement's actual value to
class members and award reasonable and proportionate
attorneys' fees, consistent with this opinion.

Judge Collins concurred in the judgment to the extent
that the majority reversed and remanded the district court's
approval of the fee award.   He dissented from the majority's
decision to affirm the approval of the underlying settlement
because, in approving the final settlement proposal before
class certification, the district court provided little
explanation as to why it approved this settlement and instead
issued a series of perfunctory orders, despite the fact that
(1) the final settlement triggers every *Bluetooth* factor;
(2) the settlement's final value ended up being nearly a
fourth of the estimated "conservative" value presented at the
preliminary approval hearing;   and   (3) the settlement's
proposed fee award comprises nearly 46% of the entire
settlement.

## COUNSEL

Theodore W. Maya (argued), Christopher Stiner, and Tina
Wolfson, Ahdoot & Wolfson PC, Burbank, California; Todd
S. Garber and Andrew C. White, Finkelstein Blankinship
Frei-Pearson and Garber LLP, White Plains, New York; Seth
A. Meyer, Meyer Law Firm PLLC, Scottsdale, Arizona; for
Plaintiffs-Appellants.

David K. Lietz (argued), Milberg Coleman Bryson Phillips
Grossman PLLC, Washington, D.C.; Mason Barney, Siri &
Glimstad LLP, New York, New York; Rachele R. Byrd,
Wolf Haldenstein Adler Freeman & Herz LLP, San Diego,
California; Daniel O. Herrera, Cafferty Clobes Meriwether
& Sprengel LLP, Chicago, Illinois; for Plaintiffs-Appellees.

Jon P. Kardassakis (argued) and Michael K. Grimaldi, Lewis
Brisbois Bisgaard & Smith LLP, Los Angeles, California,
for Defendant-Appellee.

## OPINION

LEE, Circuit Judge:

California Pizza Kitchen, Inc. (CPK) is a restaurant chain
offering California-style pizza at about two-hundred
locations across the country. But in November 2021, CPK
was not in the news for its trademark Original BBQ Chicken
Pizza or its underrated Thai Chicken Pizza. Rather, CPK
revealed that a cyberattack had compromised the personal
information of over 100,000 former and current employees.
That disclosure spurred lawyers to race to the courthouse and
file competing class action lawsuits against CPK to get a
slice of the action.

One group of plaintiffs' lawyers quickly struck a
settlement with CPK: the deal offered cash payments and
credit monitoring services to class members but CPK would
only be required to make payments to class members who
submitted valid claims (*i.e*., a claims-made settlement).
Given the low redemption rate for claims, the monetary
value of the class's claims is (at most) around $950,000—

yet the attorneys sought $800,000 in fees. A competing group of plaintiffs' lawyers challenged that settlement, contending that they could deliver a deal for the class that would top it. Despite expressing some reservations, the district court approved the settlement.

We affirm the settlement approval but remand the attorneys' fee award. District courts may approve claims-made settlements—even those that raise indicia of collusion—so long as they adhere to procedural requirements and find the settlement "fair, reasonable, and adequate" under Rule 23(e). Our review of the record shows that the district court neither procedurally erred nor abused its discretion in finding the settlement substantively acceptable. We thus affirm the approval of the class settlement. But we reverse the fee award because the district court did not assess the actual value of the settlement and compare it to the fees requested.

## BACKGROUND

### I. CPK suffers a cyberattack—and then a deluge of putative class actions.

In September 2021, CPK fell prey to a cyberattack by Conti, a ransomware group. Conti's business model is straightforward: it hacks into a company's system, encrypts the company's files, and leaves a ransom note. In exchange for payment, Conti provides its victims with a decryption key and promises not to leak the stolen data. Conti has an incentive to keep those promises—if it started releasing stolen data, then future victims would be disinclined to pay.

Faced with this sticky dilemma, CPK chose to pay the ransom. Because the breach compromised employee data (including Social Security numbers), CPK notified 103,767

of its former and current employees.   Soon, numerous plaintiffs' lawyers filed a flurry of lawsuits—five in a matter of weeks.[1]  All these class action lawsuits alleged that CPK failed to safeguard its employees' personally identifiable information, and brought claims for negligence, breach of implied contract, and violations of business and privacy statutes.

Counsel for the first four cases filed (*Gilleo*, *Morales*, *Wallace*, and *Rigas*) quickly agreed to cooperate with each other in hopes of splitting the pie among themselves.  They made overtures to the *Kirsten* plaintiffs, trying to bring them into the fold.  But those attempts went nowhere: the *Kirsten* plaintiffs had little appetite for cooperation, as their counsel had divergent views on case strategy and jockeyed for the position of lead counsel.   The district court eventually granted a stipulation consolidating *Gilleo*, *Morales*, *Wallace*, and *Rigas* into a single action—*In re California Pizza Kitchen Data Breach Litigation*.   The *Kirsten* plaintiffs trundled on alone.

## II. CPK and the consolidated plaintiffs reach a deal.

CPK and the consolidated plaintiffs proceeded straight into mediated settlement negotiations.  In March 2022, they jointly requested that the district court stay the action

---

[1] The five cases are *Gilleo, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-01928 (C.D. Cal. Nov. 23, 2021); *Morales, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-01988 (C.D. Cal. Dec. 2, 2021); *Wallace, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-01970 (C.D. Cal. Dec. 2, 2021); *Rigas, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-02004 (C.D. Cal. Dec. 7, 2021); and *Kirsten, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-09578 (C.D. Cal. Dec. 10, 2021).

pending finalization of a proposed settlement agreement.[2]
Two months later, CPK and the consolidated plaintiffs
presented a proposed settlement to the district court for
preliminary approval.    The proposed settlement class
included all former and current employees potentially
affected by CPK's data breach, with a subclass for all class
members residing in California.  The class agreed to release
all claims arising out of the data breach against CPK.  CPK,
in exchange, agreed to provide certain relief to the class.

First, CPK agreed that all class members could claim:
(1) up to $1,000 in reimbursement for ordinary expenses and
lost time incurred because of the data breach; (2) up to
$5,000 in compensation for monetary loss from actual
identity theft; and (3) 24-months' worth of credit monitoring
services, which included $1 million in identity theft
insurance.  Members of the California subclass could claim
another $100 statutory damages award, though that amount
would be counted towards the $1,000 reimbursement cap for
ordinary expenses.  The settlement agreement did not set an
aggregate cap on these benefits, so CPK could theoretically
be on the hook for massive liability.  But the agreement was
structured as a claims-made settlement, so class members
would only recover if they submitted a timely claims form
with supporting documentation—and the financial cost of
the settlement to CPK would rest on the number of valid
claims.

---

[2] Meanwhile, the district court granted CPK's motion to dismiss the
*Kirsten* plaintiffs' lawsuit for lack of standing.  The *Kirsten* plaintiffs
amended the complaint, and CPK again moved to dismiss.  The district
court dismissed a subset of those claims.  But *Kirsten* halted when it was
stayed pending this appeal.

Second, CPK committed to limited injunctive relief. Right after the cyberattack, CPK had engaged a third-party cybersecurity consultant to provide post-breach "forensics, recovery, and remediation." As part of the settlement agreement, CPK agreed to "maintain certain recently implemented business practices and remedial measures" for three years after the settlement date.

Finally, the settlement agreement permitted class counsel to request—without CPK's objection—up to $800,000 in attorneys' fees and costs. Those fees would be paid by CPK separately from any money disbursed to class members.

The consolidated plaintiffs estimated that, in aggregate, this settlement had "a conservative value of over $3.7 million." By their calculations, if only 2% of the class—which had around 103,767 members—claimed the full $1,000 in ordinary expense reimbursements, then the settlement would be worth $2,075,340. If only 5% of the California subclass—which had around 30,781 members—claimed the statutory damages amount, then that value would increase by $153,905. And if only 4% of the class claimed the credit monitoring service, which the consolidated plaintiffs valued at $15 per month per person, then another $1,494,244.80 could be stacked onto the settlement's value.

Counsel for the *Kirsten* plaintiffs objected to the settlement as collusive and the fees request as excessive. It asked the court to appoint them as lead counsel, claiming that they could negotiate a better settlement for the class.

### III. The district court separately approves the settlement and attorneys' fees.

In June 2022, the district court convened a preliminary approval hearing. At the hearing, the district court extensively analyzed the proposed settlement. It invited Bruce Friedman, the private mediator who oversaw the settlement negotiations, to testify and probed him on the parties' negotiation process. The district court questioned the consolidated plaintiffs on the many vigorous objections raised by the *Kirsten* plaintiffs. And it raised its own concerns about whether the settlement sufficiently addressed the class members' injuries.

The district court preliminarily approved the proposed settlement as "adequate, fair, and reasonable." But it declined to award attorneys' fees without knowing the number of submitted claims, and reserved that issue until after the claims process had concluded.

Once the claims deadline had passed, the consolidated plaintiffs returned to seek final approval of the settlement and attorneys' fees. The consolidated plaintiffs reported:

- 176 ordinary expense claims totaling $384,134.77;
- 979 lost time claims totaling $50,320.00;
- 45 identify theft claims totaling $191,354.50;
- 803 California statutory damages claims totaling $80,300.00; and

- 1,264 claims for credit monitoring services, valued at $455,040.00.

They represented that the class had filed 1,828 claims with a face value of $1,161,149.27, for a final claims rate of 1.8%. These claims were unvalidated, meaning that the claims administrator had not yet determined whether they were properly documented and compliant with the settlement's terms. Even without validation, one glaring error is apparent on its face: because of the $1,000 cap on ordinary expense claims, the 176 ordinary expense claims are capped at $176,000, despite the class members asking for $384,134.77. That means the maximum monetary value of the claims is, at most, around $950,000, not $1.16 million. No matter the final value of the settlement, the consolidated plaintiffs requested $773,632.95 in attorneys' fees and $26,367.05 in expenses.

The district court observed that the settlement value had dramatically deflated from the consolidated plaintiffs' earlier estimate, and expressed "tremendous concern" over the scope of attorneys' fees. After holding two hearings in November and December 2022, the district court issued final approval of the settlement in a sparse written order. It awarded the full $800,000 in attorneys' fees and costs, noting that attorneys' fees "would constitute 36.3% of the total class benefit, which is $2,133,719."[3] The written order

---

[3] The consolidated plaintiffs reported an estimated "total benefit to the class" of $2,133,719—made up of $1,161,149 in unvalidated submitted claims; $172,570 in notice and settlement administration costs; and $800,000 in attorneys' fees. But as noted earlier, the $1,161,149 is facially invalid under the settlement terms and should be reduced by over $200,000.

did not explain the court's rationale for approving the settlement and the fees.

The *Kirsten* plaintiffs timely appealed.   We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review a district court's decision to approve a class action settlement for abuse of discretion. *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021).   Our review of a district court's substantive fairness determination is narrow:  we "rarely overturn" settlements for substantive reasons but will do so if the agreement contains "convincing indications" that "self-interest rather than the class's interests in fact influenced the outcome of the negotiations." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted).   Given these substantive limitations, we hold district courts to a stringent procedural standard. *Id.* "To survive appellate review, the district court must show it has explored comprehensively all factors" relevant to the substantive fairness determination. *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation omitted).

We review a district court's award of attorneys' fees for abuse of discretion, and the factual findings supporting such an award for clear error. *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 991 (9th Cir. 2023).

## DISCUSSION

### I. The district court did not abuse its discretion in approving the class settlement.

#### A. Due process concerns require judicial approval of class action settlements.

Class action settlements, by their very nature, present "unique due process concerns for absent class members." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998). Federal Rule of Civil Procedure 23(e) thus requires judicial approval of any class action settlement and tasks district courts with ensuring that the settlement is "fair, reasonable, and adequate." Under this standard, district courts can neither rubberstamp the settlement nor unduly meddle in the parties' affairs. Although district courts are required to give "substantive consideration" to the terms of a proposed settlement, *Staton v. Boeing Co*., 327 F.3d 938, 960 (9th Cir. 2003), they are not bound by any "duty to maximize the settlement fund for class members," *Briseño*, 998 F.3d at 1027.

Before 2018, this circuit instructed courts engaging in Rule 23(e)'s "fair, reasonable, and adequate" analysis to consider the following non-exhaustive list of factors:

> [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and

[8] the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted) (known as the "*Hanlon*," "*Staton,*" or "*Churchill*," 361 F.3d 566 (9th Cir. 2004), factors).

In 2018, Rule 23(e) was amended to prescribe its own multi-factor test. To determine whether a settlement is "fair, reasonable, and adequate," courts should consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members
equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)–(D). The key *Hanlon* factors are
now baked into the text of Rule 23(e), and the remaining
ones can still be considered for Rule 23(e)(2) analysis. *See
McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 609 n.4 (9th
Cir. 2021).

Another concern lurks in the background of every class
action settlement: "class counsel may collude with the
defendants, tacitly reducing the overall settlement in return
for a higher attorney's fee." *In re Bluetooth Headset Prods.
Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal
quotation omitted). In *Bluetooth*, we identified three "subtle
signs that class counsel have allowed pursuit of their own
self-interests and that of certain class members to infect the
negotiations." *Id*. at 946–47. Those are: "(1) when counsel
receives a disproportionate distribution of the settlement;
(2) when the parties negotiate a 'clear sailing arrangement,'
under which the defendant agrees not to challenge a request
for an agreed-upon attorney's fee; and (3) when the
agreement contains a 'kicker' or 'reverter' clause that returns
unawarded fees to the defendant, rather than the class."
*Briseño*, 998 F.3d at 1023 (quoting *Bluetooth*, 654 F.3d at
947) (internal quotations and alterations omitted).

If these indicia of implicit collusion are present, then a
proposed settlement "must withstand an even higher level of
scrutiny for evidence of collusion or other conflicts of
interest than is ordinarily required under Rule 23(e)."
*Bluetooth*, 654 F.3d at 946. The district court must
especially "assure itself that the fees awarded in the
agreement were not unreasonably high." *Id.* at 947 (internal
citations and alterations omitted).

But before we can review the district court's settlement approval order, we first must address a unique wrinkle here: the district court's preliminary and final approval orders were sparse—almost boilerplate—and memorialized little of the district court's rationale.    Usually, when we cannot determine the district court's reasoning, we remand the case for the court to explain its rationale.    But here, we can reasonably infer the district court's rationale from the record, which was unusually extensive with multiple hearings and supplemental briefs.    *See, e.g.*, *Hanlon*, 150 F.3d at 1023 ("Although the district court's [class certification] findings are almost conclusory, the record provides more than adequate foundation upon which to reach our conclusions."); *In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (the district court's "conclusory statement[s]" could be supported by the record, which reflected an "extensive settlement hearing").[4]    From the district court's exhaustive questions and statements, as well as the parties' responses, at the various hearings, we can reasonably deduce what factors the district court considered when approving the settlement.

---

[4] We are not suggesting that we will approve class action settlements based on conclusory written orders. We do so in spite of it here. Indeed, we have vacated settlement approval orders when we could not glean the district court's reasoning from the record. *See, e.g., Allen*, 787 F.3d at 1224 (vacating order because "the record before us does not allow us to undertake . . . review"); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1050, n.13 (9th Cir. 2019) (stating that the "record does not permit" the court to review the order). In contrast here, we can sufficiently discern the court's reasoning given the voluminous record and extensive hearings.

### B. The district court applied the *Bluetooth* heightened standard to review the settlement for collusion.

We now address whether the district followed the *Bluetooth* procedural safeguards in approving a class settlement. The *Kirsten* plaintiffs correctly point out that the settlement raises all three red flags of potential collusion under *Bluetooth*. 654 F.3d at 947.

First, *Bluetooth* warns that a class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion. *See Briseño*, 998 F.3d at 1026 (a "gross disparity in distribution of funds between class members and their class counsel raises an urgent red flag"). Here, the parties agreed to $800,000 in fees, even though the monetary value of the settlement is at most $950,000.

Second, the parties agreed to a so-called "clear sailing" provision in which CPK agreed that it would not challenge the agreed-upon attorneys' fees. *See Bluetooth*, 654 F.3d at 947 (these provisions potentially "enabl[e] a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class").

And third, if a settlement has a "reverter" or a "kicker" provision, it could imply collusion. *See Bluetooth*, 654 F.3d at 949 (reverter provisions "amplif[y] the danger of collusion already suggested by a clear sailing provision"). A reverter in a class action settlement means that any fees not awarded to class counsel would revert to the defendant's coffers, and not to the class members. Here, it means that if the district court had reduced fees below $800,000, then CPK's

obligation to pay attorneys' fees would be reduced, with no additional funds given to the class.

CPK contends that claims-made settlements do not contain reverter provisions, and so *Bluetooth* cannot apply. In a claims-made settlement, the defendant waits until after the claims process concludes—*i.e.*, class members have submitted forms to seek compensation and the claim administrator validates them—to pay out the amount claimed by class members. By contrast, in a common-fund settlement, the defendant establishes a pot of money (*i.e.*, a "common fund") before the claims process begins. If a common-fund settlement includes a reversionary provision, then the defendant can recoup whatever amount is left in the fund after paying out class members' claims. Because a claims-made settlement only requires CPK to pay out the amount claimed, the argument goes, no money reverts to CPK, so there technically can be no reverter provision and thus no *Bluetooth* scrutiny.

That argument fundamentally misunderstands *Bluetooth*'s purpose. The reverter provision flagged in *Bluetooth* addresses what happens to unawarded attorneys' fees. 654 F.3d at 947. In a class action settlement, the defendant has no incentive to differentiate between (i) payments made to class members and (ii) payments made to class counsel—and is only concerned about minimizing the total payment. *See, e.g.*, *Staton*, 327 F.3d at 964; *Briseño*, 998 F.3d at 1025. Put another way, a defendant will happily pay more to class counsel at the expense of the class if it means that its total liability—*i.e.*, attorneys' fees and payment to the class—will be lower. *See Briseño*, 998 F.3d at 1025.

So when class counsel and the defendant include clear sailing and reverter provisions in the settlement, they might be benefiting themselves—at the expense of the class members. The district court may ultimately award less than the agreed-upon attorneys' fees, despite a clear sailing provision in which the defendant agrees not to challenge it. But if the court does so, then the unawarded fees would ideally be distributed to the class, as the defendant is already willing to pay that amount to secure the settlement. *See Briseño*, 998 F.3d at 1027 ("[T]here is no plausible reason why the class should not benefit from the spillover of excessive [attorneys'] fees."). Yet a reverter directs the unawarded fees to be given back to the defendant instead of the class members. *Bluetooth* directs courts to be skeptical of such settlements because they hint at collusion between the class counsel and the defendant.

This fear of collusion applies equally to both claims-made settlements and common-fund settlements. Whether money leaves the defendant's hands is immaterial. In either case, the purpose of *Bluetooth*'s heightened scrutiny is to probe settlements for signals that class counsel may have colluded with the defendant by selling out the class's interests in exchange for higher fees.

Having established that *Bluetooth* applies, we are satisfied that the district court fulfilled its heightened obligation to ferret out any "evidence of collusion or other conflicts of interest." 654 F.3d at 946. As we have recognized, the presence of all three *Bluetooth* factors does not trigger a domino effect that makes a settlement per se collusive. *See Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (noting that the presence of all three factors is not a "death knell"). *Bluetooth* is merely a procedural safeguard to ensure that district courts scrutinize class settlements for

collusion that may harm class members.  It does not set
crusty, rigid rules that mandate a substantive result.

Here, the district court gave the settlement provisions a
hard look under the *Bluetooth* factors.  It probed the parties'
disputes over whether CPK's decision to negotiate with the
consolidated plaintiffs amounted to a "reverse auction,"
whether the *Kirsten* plaintiffs' counsel's "effort to become
class counsel" was improper, and whether a "claims-made
settlement" was "inherently collusive."  It questioned Mr.
Friedman, the parties' private mediator, on the parties' "term
sheets" and "settlement proffer[s]," and how many
negotiation sessions the parties conducted.  In its preliminary
approval order, it made an explicit finding that the settlement
was "non-collusive."  On this record, we cannot say that the
district court ignored the *Bluetooth* factors or abused its
discretion.

### C. The district court did not abuse its discretion in finding the settlement fair, reasonable, and adequate.

We next substantively review the class settlement and
hold that the district court did not abuse its discretion in
finding it fair, reasonable, and adequate.  The district court
properly evaluated the settlement under the Rule 23(e)(2)
factors as well as the judicially-crafted *Hanlon* factors.

The district court found the relief for the class adequate
after considering a host of concerns.  Fed. R. Civ. P.
23(e)(2)(C) (requiring the settlement be "adequate" for the
class and listing factors to consider).  For example, the
district court identified the key harm to the class (the
disclosure of sensitive personal information) and ensured
that class members were compensated for it.  And the
settlement offers real benefits to class members:  credit

monitoring services for two years, up to $1,000 for ordinary
expenses and lost time, and up to $5,000 for monetary loss
from identity theft.  The district court also considered the
California Consumer Privacy Act (CCPA) claims—which
potentially conferred statutory damages to the California
subclass—in assessing the adequacy of the settlement.

On appeal, the *Kirsten* plaintiffs contend that they could
have notched a more favorable settlement on behalf of the
class.  They maintain, for example, that the CCPA claims are
possibly worth over $77 million in statutory damages, and
that the settlement released them for only a small sliver of
that amount.  But the accuracy of that valuation is tenuous at
best.  The *Kirsten* plaintiffs provide no legal authority for
their valuation of the CCPA claims and have not rebutted
CPK's potential legal defenses against them.

The district court also weighed the "significant risks,
expense, and/or uncertainty" that the class would face in
litigation.  Fed. R. Civ. P. 23(e)(2)(C)(i) (listing "the costs,
risks, and delay of trial and appeal" as a factor in assessing
adequacy).  For instance, Article III standing can be an uphill
battle for data-breach plaintiffs, who must allege a "concrete
harm," not just an "asserted risk of future harm."
*TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021).
Here, the class's standing rested on questionable footing—
there is no evidence that any CPK employee's compromised
data was misused, and the hacker group is apparently known
for not releasing the information to the dark web once it
receives its ransom payment.

Lastly, we underscore that courts do not have a duty to
maximize settlement value for class members.  *Briseño*, 998
F.3d at 1026.  Rather, our inquiry is much more modest and
limited to ensuring that the class settlement is fair,

reasonable, and adequate.  Perhaps the *Kirsten* plaintiffs'
counsel could have obtained a better deal if they had litigated
the case further.  But reasonable disagreements on case
strategy are not evidence of an unfair deal or collusion.  An
early settlement may often be beneficial for the class, as it
reduces attorneys' fees, preserves value for the class, and
offers immediate compensation for injured class members.[5]

The most problematic part of the class settlement is its
claims-made nature.  As evidenced by the 1.8% claims rate
here, redemption rates are typically very low because most
class members do not bother jumping through the hoops to
submit a claim.  *See, e.g., Roes*, *1–2*, 944 F.3d at 1053;
*Briseño*, 998 F.3d at 1026.  As a result, claims-made
settlements often allow defendants to settle on the cheap.
But we have never held that claims-made settlements are per
se inadequate under Rule 23(e).  And here, the settlement
does offer real benefits—not worthless coupons or
imaginary injunctive relief—to the people who submitted
claims.  We cannot say that the district court abused its
discretion in finding the settlement fair, reasonable, and
adequate.[6]

---

[5] The court also addressed other factors under Rule 23(e) and *Hanlon.*
For example, it found that the proposal was negotiated at arm's length.
Fed. R. Civ. P. 23(e)(2)(B).  To be sure, the presence of a mediator is not
dispositive, as mediation has become a cottage industry with repeat
players.  *See, e.g., Roes, 1–2*, 944 F.3d at 1050 n.13.  But here, the district
court assured itself that Mr. Friedman's mediation of the parties'
settlement negotiations was more than a pro forma exercise.

[6] Both the majority and dissent agree that the lack of a detailed written
order made appellate review more difficult.  While there were extensive
hearings, off-the-cuff oral statements often lack clarity and are subject to
differing interpretations.  For example, the dissent believes the court at

## II. We reverse and remand the approval of excessive attorneys' fees.

Finally, we address the district court's fee award of almost $800,000. Because the settlement agreement was not conditioned on attorneys' fees, we can vacate the fee award without undoing the settlement approval, as the settlement still passes muster under Rule 23(e). *See Bluetooth*, 654 F.3d at 945; *McKinney-Drobnis*, 16 F.4th at 606.

Courts may only award "reasonable" attorneys' fees. Fed. R. Civ. P. 23(h). The "touchstone" for that analysis is "the benefit to the class"—class counsel can only reap rewards if they have delivered results for class members. *Lowery*, 75 F.4th at 988. This circuit has signed off on two methods for determining reasonable attorneys' fees in class actions: the "lodestar" method and the "percentage-of-recovery" method. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (en banc). Under the lodestar method, the court multiplies the number of hours reasonably spent on the case by a reasonable hourly rate. *Id*. Under the percentage-of-recovery method, the court simply

---

the preliminary approval hearing indicated that it likely would not approve a settlement worth less than $3 million. Dissent at 43. But we do not believe that court was making such a categorical statement when it said "And if they end up with 3.2 million, I'd probably look very favorably, or even 2.5. I don't know. Looking very favorably." Another complicating factor is that a court may not tick off every single factor or reason it considered during an oral hearing. But based on our review of the record, we believe the court sufficiently probed and analyzed the key points, such as the settlement's benefit to the class and the attorneys' fees relative to that benefit. As explained, the court first flagged the possibility of an outsized fee amount if redemption rates turned out to be low but then ignored this problem when the redemption percentage was indeed low. As explained below, we thus reverse and remand on the fees amount.

awards counsel with a percentage of the recovery claimed by
the class—the typical benchmark is 25%. *Id.* Under both
methods, certain factors, like "the quality of representation,
the benefit obtained for the class, the complexity and novelty
of the issues presented, and the risk of nonpayment," may
favor upward or downward adjustment. *Bluetooth*, 654 F.3d
at 942.

Unlike the district court's settlement approval, we cannot
infer the district court's rationale for its fee award from the
record. At the November 2022 hearing, the district court
raised "tremendous concern[s]" about the reasonableness of
the consolidated plaintiffs' $800,000 fee request. First, it
questioned the lodestar of $687,681. Although the district
court noted that the blended hourly rate of $670 seemed
reasonable, it asked about the sheer "number of attorneys
allegedly making appearances" in the case. Second, the
district court appeared disinclined to award fees "clearly
above the benchmark of 25%" percentage-of-recovery.

Yet its final award did just that—even though the
attorneys' fees constitute around 45% of the settlement value
to the class. In a short, two-paragraph order, the district court
signed off on a positive multiplier to counsel's lodestar, even
though the fees were significantly over the 25% percentage-
of-recovery benchmark. The court failed to "provide an
adequate explanation" for the fees, so we must reverse and
remand. *Lowery*, 75 F.4th at 992 (citing *Stanger v. China
Elec. Motor, Inc.*, 812 F.3d 734, 739 (9th Cir. 2016)).

Even apart from its failure to provide an explanation, the
district court erred by approving fees that appear excessive
of settlement value. To assess the reasonableness of fees, the
district court must first independently "calculate the class
action settlement's benefit to the class members." *Id.* In a

claims-made settlement, that obligation requires the district court to wait until at least after the claims deadline to award attorneys' fees. When the claims validation process is brief or where the settlement presents a significant risk of fraudulent or invalid claims (*e.g.*, settlements offering potentially lucrative compensation), that may even require the district court to wait until after the claims validation process has concluded.

Here, the district court appeared to accept the consolidated plaintiffs' assertion that the class's claims were worth $1.16 million, despite the substantial likelihood that many of these claims would be thrown out post-validation for exceeding the caps or failing to provide supporting documentation. As noted earlier, that $1.16 figure is facially invalid based on the settlement agreement, which caps ordinary expense claims at $1,000. As the consolidated plaintiffs conceded at oral argument, the class's 176 ordinary expense claims could, at most, theoretically be $176,000. Yet the consolidated plaintiffs claimed that ordinary expenses would be $384,134.77. So, at most, the monetary value of the class's claims is around $950,000, not $1.16 million. And that amount may be far less after validation. A fee award of $800,000 would then constitute at most around 45% of settlement value, a significant departure from our 25% benchmark.[7]

_____

[7] Specifically, the $800,000 fee award is around 45% of $1.75 million, which is made up of $950,000 in the class's claims and $800,000 in fees. District courts have discretion to include notice and administration costs in their calculation of settlement value under the percentage-of-recovery method, but that determination should be driven by reasonableness. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir.

On remand, the district should scrutinize the reasonableness of the consolidated plaintiffs' lodestar. It should then calculate the actual value of the settlement to the class and perform a crosscheck of the lodestar against the 25% percentage-of-recovery benchmark to ensure that fees are reasonable. Based on the record before us, that method will likely favor downward adjustment.

## CONCLUSION

We **AFFIRM** the district court's settlement approval but **REVERSE** the attorneys' fee award. We **REMAND** for the district court to determine the settlement's actual value to class members and award reasonable and proportionate attorneys' fees, consistent with this opinion.

---

COLLINS, Circuit Judge, concurring in the judgment in part and dissenting in part:

I concur in the judgment to the extent that the majority reverses and remands the district court's approval of the attorney's fee award. I respectfully dissent, however, from the majority's decision to affirm the approval of the underlying settlement in this case.

Under our precedents and Federal Rule of Civil Procedure 23(e), district courts must closely scrutinize the substantive fairness of class action settlement proposals. As we have recognized, "'settlement class actions present

---

2015). So, for example, it may not make sense to include notice and administration costs if they approach or exceed the value of the monetary and injunctive relief benefits to the class. Here, even if the district court included the $172,570 in notice costs in its calculations, the $800,000 fee award would still constitute around 41.5% of settlement value.

unique due process concerns for absent class members,' and the district court has a fiduciary duty to look after the interests of those absent class members." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted). Accordingly, a district court "may approve" a class action settlement "only on finding that it is fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Allen*, 787 F.3d at 1223–24 (citation omitted).

This duty is even more stringent, we have held, "when a settlement is negotiated absent class certification." *Allen*, 787 F.3d at 1224. "Specifically, such settlement agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048–49 (9th Cir. 2019) (simplified). This higher scrutiny is required in order "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs." *Id.* at 1049 (simplified). "The subtle signs of collusion for which we require district courts to look," *id.* (simplified), are drawn from our decision in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011). These "*Bluetooth* factors" include the following danger signs: "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a clear sailing arrangement (*i.e.*, an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed funds to the defendant."

*Allen*, 787 F.3d at 1224 (simplified).  Although the presence of these factors "is not a death knell" for a settlement, "when they exist, they require the district court to examine them" and "develop the record to support its final approval decision." *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (simplified).

Here, in approving the final settlement proposal before class certification, the district court failed to follow these procedural requirements.  It provided little explanation as to why it approved this settlement and instead issued a series of perfunctory orders, despite the fact that, *inter alia*, (1) the final settlement triggers every *Bluetooth* factor; (2) the settlement's final value ended up being nearly a fourth of the estimated "conservative" value presented at the preliminary approval hearing; and (3) the settlement's proposed attorney's fees award comprises nearly 46% of the entire settlement.   The district court's failure to adequately examine any of these issues compels reversal and remand. Because the majority nonetheless upholds the district court's approval of the settlement, I respectfully dissent.

# I

## A

In September 2021, California Pizza Kitchen ("CPK"), a national restaurant chain, suffered a data breach that exposed the names, Social Security numbers, dates of birth, and other personal identifying information of over 100,000 current and former employees.  On November 15, 2021, CPK, after investigating the breach, sent notification letters to 103,767 individuals whose personal information may have been compromised as a result of the breach.

Soon thereafter, five putative class actions were filed in the United States District Court for the Central District of California, seeking monetary and equitable relief for a nationwide class of persons whose personal identifying information was accessed by the breach.[1]  The last of these suits was filed on December 10, 2021 by plaintiffs Aviva Kirsten and Jeremy Pittman (the "*Kirsten* Plaintiffs"), who are the Appellants in this case.  In contrast to the complaints of the first four plaintiff groups (the "Settling Plaintiffs"), the *Kirsten* Plaintiffs' complaint explicitly asserted a claim under the California Consumer Privacy Act ("CCPA").  *See* CAL. CIV. CODE § 1798.100 *et seq*.  That statute, under certain conditions, allows for statutory damages between \$100 and \$750 for California residents whose personal identifying information was "subject to an unauthorized access and exfiltration, theft, or disclosure as a result of" a business's failure to maintain digital security procedures.  *Id.* § 1798.150(a)(1)(A); *see also id*. § 1798.140(i) (generally defining a "consumer" covered by the CCPA as "a natural person who is a California resident").  The *Kirsten* Plaintiffs' operative complaint stated that, once the ongoing statutory advance-notice process was completed, the complaint would be amended to assert a formal request for CCPA statutory damages.

Two days before the complaint in *Kirsten* was filed, the Settling Plaintiffs agreed to coordinate their efforts.  After

---

[1] *Gilleo, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-01928 (C.D. Cal. Nov. 23, 2021); *Morales v. California Pizza Kitchen, Inc.*, No. 8:21-cv-01988 (C.D. Cal. Dec. 2, 2021); *Wallace, et al. v. California Pizza Kitchen, Inc.*, No. 8:21-cv-01970 (C.D. Cal. Dec. 2, 2021); *Rigas, et al. v. California Pizza Kitchen, Inc.*, No. 8:21-cv-02004 (C.D. Cal. Dec. 7, 2021); and *Kirsten, et al. v. California Pizza Kitchen, Inc.*, No. 2:21-cv-09578 (C.D. Cal. Dec. 10, 2021).

initiating their suit, the *Kirsten* Plaintiffs reached out to the
Settling Plaintiffs "to meet and confer about streamlining
efforts and potentially coming to consensus on leadership."
However, these attempts to reach consensus failed.

Attempts to consolidate all five cases also failed. On
January 24, 2022, the *Kirsten* Plaintiffs drafted and
circulated a stipulation to consolidate the five cases and
establish a briefing schedule for the appointment of lead
class counsel. Fifteen days later, the Settling Plaintiffs
circulated their own version of the stipulation, and the
*Kirsten* Plaintiffs sent back redlines of the draft stipulation,
which, *inter alia*, proposed a shorter briefing schedule for
contested leadership motions. The next day, the Settling
Plaintiffs responded with an edited draft stipulation rejecting
the *Kirsten* Plaintiffs' proposed leadership motion schedule.
After five days, the Settling Plaintiffs, without hearing back
from the *Kirsten* Plaintiffs, filed a stipulation and a proposed
order consolidating the four other cases. In a footnote, the
stipulation noted the existence of the *Kirsten* litigation,
stating that "the parties to this stipulation were unable to
obtain agreement to this stipulation from plaintiffs in that
action." Without comment, the district court then entered the
proposed order consolidating the four cases. The deadline
for lead counsel motions was set for March 17, 2022.

**B**

Meanwhile, the Settling Plaintiffs had begun discussing
settlement with CPK. After a mandatory pre-motion
conference with CPK's counsel concerning CPK's
anticipated motion to dismiss, counsel in the *Wallace* case
had "substantial questions in [his] mind about the viability
of Plaintiffs' claims in this litigation." He subsequently
drafted a settlement proposal term sheet, which he first

circulated to his co-counsel and then, on January 26, 2022, to CPK's counsel. The term sheet proposed a claims-made settlement and included a demand for compensation for statutory claims under the CCPA.

On February 9, 2022, the *Kirsten* Plaintiffs and CPK conferred about scheduling in the *Kirsten* litigation. After this meeting, CPK's counsel sent an email to the *Kirsten* Plaintiffs' counsel asking, "Would you consider for example a claims made style settlement? Do you have a proposed term sheet?" The *Kirsten* Plaintiffs responded that the parties would need to exchange information and set a mediation before engaging in any settlement talks.

Following consolidation, the Settling Plaintiffs and CPK began settlement talks in earnest. The parties engaged in informal discovery regarding CPK's insurance coverage and the data breach. The parties selected a mediator and engaged in their first mediation session, via Zoom, on March 10, 2022. This mediation session was not fully successful, but the parties agreed to meet again on March 15 for another mediation session on Zoom.

Four days later, on March 14, 2022, CPK's counsel and the *Kirsten* Plaintiffs' counsel conferred pursuant to Federal Rule of Civil Procedure 26(f). During that conference, the *Kirsten* Plaintiffs asked CPK whether the company was negotiating with any other plaintiffs' counsel and about the status of any such negotiations. Although there is some dispute over what precisely was said on this call, it is undisputed that CPK did not mention its ongoing mediation with the Settling Plaintiffs.

The next day, on March 15, 2022, the Settling Plaintiffs and CPK held their second mediation session, where they ultimately came to agreement on the material terms of

settlement, including an award of attorney's fees.  On March
16, 2022, they informed the district judge's courtroom
deputy clerk that they had reached a settlement in principle,
*see* C.D. CAL. LOC. CIV. R. 16-15.7, and they also filed a
stipulation requesting that the district court stay the
consolidated action pending approval of the proposed
settlement.  Motions for appointment of lead counsel would
have been due the next day.

On March 17, 2022, the *Kirsten* Plaintiffs filed a motion
to have their counsel appointed lead counsel, together with
an opposition to the settling parties' request for a stay.
Nonetheless, the district court promptly granted the
requested stay of proceedings, pending the filing and
disposition of a motion for preliminary approval of the
settlement.

On April 22, 2022, the district court held a hearing
concerning the *Kirsten* Plaintiffs' lead counsel motion.  The
court stated that "[i]t seems just odd on my part that I
wouldn't consolidate all five cases" and wondered out loud
why it had not done so, but the court ultimately decided "to
leave the case[s] divided" and to hold the lead counsel
motion in abeyance while the district court evaluated the
Settling Plaintiffs' motion for preliminary approval.  The
Settling Plaintiffs filed a motion for preliminary approval on
May 2, 2022, and the court subsequently scheduled a hearing
on the motion for June 29, 2022.

**C**

Before summarizing the preliminary approval hearing, I
will first describe (1) the key terms of the proposed class
settlement between the Settling Plaintiffs and CPK; and
(2) the *Kirsten* Plaintiffs' written objections to the settlement
prior to the preliminary approval hearing.

**1**

Under the terms of the proposed settlement, the Settling Plaintiffs agreed that "every Settlement Class member (except those who timely opt out)" would "fully and finally release CPK . . . from any and all claims or causes of action, whether known or unknown, that concern, refer or relate to the Data Security Incident announced by CPK on or about November 15, 2021, and all other claims arising out of the Data Security Incident announced by CPK on or about November 21, 2021, that were asserted, or that could have been asserted, in the Consolidated Cases." In return, CPK agreed to a claims-made settlement, *i.e.*, one in which only those class members who submitted timely, valid claims could receive any payment. That claims-made settlement would provide the following relief:

- Up to $1,000 per claimant for "out-of-pocket expenses and lost time" incurred as a result of the data breach.

- Up to $5,000 per claimant for "extraordinary losses," *i.e.*, "proven monetary loss as a result of actual identity theft."

- A $100 "statutory damages award" for "California Settlement Subclass members," which could be combined with a claim for out-of-pocket expenses, but "subject to the $1,000 cap on compensation for ordinary losses and lost time."

- "24 months of 3[-]bureau credit monitoring to Settlement Class members

who enroll," which the Settling Plaintiffs
valued at $360 per claimant.

In the settlement, CPK also agreed to a clear-sailing
provision whereby it "agree[d] not to object to [the Settling]
Plaintiffs' request for combined attorneys' fees and costs to"
their counsel "in an amount not to exceed a total of $800,000,
inclusive of costs."  CPK further agreed to "maintain certain
recently implemented business practices and remedial
measures . . . for a period of three (3) years" to safeguard
against future data breaches.

Under the agreement, class members would receive
notice of the settlement primarily through notices sent to the
respective postal addresses or email addresses "associated
with" each class member.  There would also be a website and
toll-free number for any inquiries regarding the settlement.
The agreement provided for a specified class action
settlement administrator to administer the claims, including
providing notice to class members, with CPK being
responsible for all costs of the settlement administration.

**2**

In their written opposition to the Settling Plaintiffs'
motion for preliminary approval, the *Kirsten* Plaintiffs raised
six objections to the proposed settlement.

First, the *Kirsten* Plaintiffs asserted that because the
settlement is claims-based and allows any unclaimed funds
to remain with CPK, the settlement is functionally
reversionary, thereby presenting one of the "subtle signs"
this court has identified of potential collusion between class
counsel and defendant's counsel.  *Allen*, 787 F.3d at 1224.
The *Kirsten* Plaintiffs argued that "[r]eversionary clauses are
highly disfavored in the Ninth Circuit," because they

promote "perverse incentives" for "defendants to ensure as low a claims rate as possible" and because they "can benefit both defendants and class counsel, and thus raise the specter of their collusion, by (1) reducing the actual amount defendants are on the hook for . . . ; and (2) giving counsel an inflated common-fund value against which to base a fee motion."[2] *Roes, 1–2*, 944 F.3d at 1058–59 (simplified).

Second, the *Kirsten* Plaintiffs objected to the settlement's inclusion of a "clear sailing agreement," that is, a provision that CPK would "not object to an amount of $800,000 paid in attorney fees." In doing so, the *Kirsten* Plaintiffs relied on caselaw holding that "clear sailing agreements on attorney's fees are important warning signs of collusion because the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Roes, 1–2*, 944 F.3d at 1051 (simplified).

Third, the *Kirsten* Plaintiffs contended that CPK's potential liability was $77 million, but that the proposed settlement's ceiling for liability was approximately $38 million with "[t]he only guaranteed payment under the [s]ettlement [being] the $800,000 in attorney fees" to the Settling Plaintiffs' counsel. As a result, the *Kirsten* Plaintiffs argued, "[t]he amount offered in [the] [s]ettlement is unfair, unreasonable and inadequate." The *Kirsten* Plaintiffs also asserted that, because "[t]he CCPA claim is arguably the

---

[2] The settlement here technically is not "reversionary" because it did not establish a common fund from which any unclaimed funds would revert to CPK. However, as the majority correctly recognizes, there is no functional difference between a formal reversion and a purely claims-made settlement structure, as both leave any unclaimed funds with the defendant. *See* Opin. at 18–19.

most valuable claim in the litigation against CPK" and
"[n]one of the Settling Plaintiffs asserted a CCPA claim," the
Settling Plaintiffs were "not adequate to negotiate and
release the CCPA claims."   According to the *Kirsten*
Plaintiffs, CPK "intentionally chose the weakest opponents
in this litigation" with which to "negotiate . . . , while
excluding the one [plaintiff group] that did assert CCPA
claims," *i.e.*, the *Kirsten* Plaintiffs, "from the mediation."

Fourth, the *Kirsten* Plaintiffs criticized the settlement's
one-time mail/e-mail notice plan as inadequate.   In their
view, the notice plan should also have included "(1) a
reminder notice program, (2) a targeted social media/internet
advertising campaign, and (3) a publication of the notice
through CPK's employee intranet or other internal employee
communication system."   According to the *Kirsten*
Plaintiffs, option (3) would have been free, and the other two
would have "cost very little."

Fifth, the *Kirsten* Plaintiffs argued that the settlement's
release was overbroad because it extended to any claims that
"relate to" the data breach in question.

Sixth, the *Kirsten* Plaintiffs also contended that
additional circumstances surrounding the settlement talks
underscored the potentially collusive nature of the
settlement. The *Kirsten* Plaintiffs highlighted the facts that
(1) they were not included in the stipulation for
consolidation; and (2) CPK had avoided informing them of
the ongoing settlement negotiations with the Settling
Plaintiffs. The *Kirsten* Plaintiffs also observed that the
settlement was reached the day before motions for the
appointment of lead counsel would have been due and that
they had previously rejected any claims-made settlement
structure in their discussions with CPK.   The *Kirsten*

Plaintiffs further argued that the mere fact that a mediator had presided over the settlement negotiations was no guarantee of its compliance with Rule 23(e)(2).

**D**

At the preliminary approval hearing held on June 29, 2022, the mediator took the stand and answered questions from the court. The district court stated that, based on the Settling Plaintiffs' representations, "the settlement ha[d] a conservative value [of] over $3.7 million," and the $800,000 in attorney's fees amounted to "approximately 21 percent of the value of the settlement." Nonetheless, the district court discerned "some due process issues with" the fact that the settlement would resolve the claims in the *Kirsten* litigation, despite the *Kirsten* Plaintiffs' lack of involvement in the mediation. Moreover, the district court stated that it had "a tremendous concern about these fees," due to the "reversionary" nature of the settlement.

After returning from a recess, the district court announced that it would preliminarily find that the settlement was "adequate, fair, and reasonable." The court then expressly addressed only one of the *Kirsten* Plaintiffs' objections, namely, the claims-made structure of the settlement. The district court declined to approve the $800,000 in attorney's fees at that time, explaining that it would wait to see how many claims were made in order to "incentivize[]" the Settling Plaintiffs' counsel "to get as much money for this class" during the claims process. The court indicated that it would "probably" approve the requested attorney's fees if the total settlement value amounted to approximately $3.2 million "or even" $2.5 million. The district court offered no comment on any of the *Kirsten* Plaintiffs' other written objections, nor did the court

set forth on the record any express findings justifying its
conclusions.

On June 30, 2022, the district court issued a written order
preliminarily approving the settlement and finding the
settlement "to be fair, reasonable, and adequate, and the
result of vigilant, informed, non-collusive arms'-length
negotiations overseen by an experienced and neutral
mediator." The court stated, without further explanation,
that it "considered . . . the briefs and arguments of counsel."
As the majority puts it, "the district court's preliminary . . .
order[] w[as] sparse—almost boilerplate and memorialized
little of the district court's rationale." *See* Opin. at 16.

**E**

Following the preliminary approval of the settlement, the
Settling Plaintiffs and the class administrator sent out
103,380 direct postcard notices and 4,349 email notices to
potential class members. Thereafter, a follow-up email
notice was sent to more than 60,500 class members. There
was also a targeted social media campaign on Facebook,
Instagram, and LinkedIn. Despite these efforts, which went
beyond the minimum notice provisions to which the *Kirsten*
Plaintiffs had objected, the class administrator ultimately
received only 1,828 unvalidated claims for a claims rate of
less than 1.8%.

On October 6, 2022, the Settling Plaintiffs filed their
motion for final approval of the settlement. The *Kirsten*
Plaintiffs objected, essentially re-raising the same concerns
they had voiced prior to the preliminary approval hearing.
They also pointed out that, after the preliminary approval
hearing, their CCPA claims had survived both a motion to

dismiss and a motion for reconsideration.[3]   The *Kirsten*
Plaintiffs further argued that the low claims rate highlighted
that CPK would be "securing a full release" from the class
"for a very low dollar cost" and that the settlement's "notice
scheme was woefully inadequate."

At the final approval hearing on November 7, 2022, the
Settling Plaintiffs confirmed that the claims rate was
approximately 1.8%, and they asserted that the final
settlement value, prior to claim validation, was \$1,161,149.[4]
According to the Settling Plaintiffs, the claims made were as
follows:

> - 176 claims for ordinary expenses,
>   totaling \$384,134.77;
>
> - 979 claims for lost time, totaling
>   \$50,320.00;
>
> - 45 claims for extraordinary losses,
>   totaling \$191,354.50;
>
> - 803 claims for CCPA statutory damages,
>   totaling \$80,300.00; and
>
> - 1,264 claims for credit monitoring,
>   totaling \$455,040.00.

The court then asked the *Kirsten* Plaintiffs to repeat their
objections on the record.   The *Kirsten* Plaintiffs recounted

---

[3] CPK filed motions to dismiss only in the *Kirsten* case and not in the
consolidated cases.

[4] As the majority agrees, however, counsel's representation as to this
"final settlement value" was flatly inaccurate: the settlement's final value
is closer to \$950,000.   *See* Opin. at 11; *see infra* Section II.A.

that the settlement includes a clear-sailing provision; that the settlement was reversionary and had ultimately gotten "nowhere near the suggested 3 million or in excess of that"; and that, consequently, the Settling Plaintiffs' counsel were receiving "a disproportionate amount of the settlement"— approximately 40%—in attorney's fees.   The *Kirsten* Plaintiffs also pointed out that the Settling Plaintiffs had not undergone any motions practice at all, which, in the *Kirsten* Plaintiffs' view, demonstrated that the Settling Plaintiffs "gave up . . . leverage" by settling with CPK.

The district court responded that it had already "gone through the collusion arguments" and "rejected those."  With respect to the settlement's final value at $1.16 million, the court merely stated that it could not "recall why" it had earlier expected the settlement to amount to $3 million.  The district court also noted its "tremendous concern over these attorney's fees" of up to $800,000.  At the conclusion of the hearing, the district court requested additional briefing on the issue of attorney's fees.  The district court did not discuss the remainder of the *Kirsten* Plaintiffs' objections, nor did it set forth on the record any of its findings.

The district court received the requested briefing concerning the attorney's fees and held another hearing on December 5, 2022.[5]   Thereafter, the district court on February 22, 2023 approved the settlement and awarded the maximum $800,000 in attorney's fees to the Settling Plaintiff's counsel.   The court's order contains no explanation for its ruling and merely states that the court "reviewed . . . any objections filed with or presented to the

---

[5] Oddly enough, there does not appear to be any transcript of the December 5, 2022 hearing in the record of the district court or of this court.

Court" and the "oral argument of counsel and any objectors
who appeared."  Like the preliminary approval order, as the
majority puts it, "the district court's . . . final approval
order[]     w[as]     sparse—almost     boilerplate—and
memorialized little of the district court's rationale."  *See*
Opin. at 16.

## II

Given these details in the record, it is clear that the
district court contravened its duty to explain why the
settlement complied with Rule 23(e).  Accordingly, the
settlement approval should be vacated, and the case should
be remanded.

## A

"To survive appellate review, the district court must
show it has explored comprehensively *all* factors, and must
give a reasoned response to *all* non-frivolous objections."
*Allen*, 787 F.3d at 1223–24 (emphasis added) (simplified).
And because, as the majority correctly recognizes, the
settlement has a claims-made structure that resulted in a
claims rate of less than two percent, provides attorney's fees
equivalent to 84% of the settlement's benefit to the class, and
contains a clear-sailing provision for these fees, the
settlement here "raises all three red flags of potential
collusion under" our caselaw.  *See* Opin. at 17.  The district
court therefore had a "heightened obligation" to scrutinize
the settlement for "any evidence of collusion or other
conflicts of interest."  *See* Opin. at 19 (simplified).

The district court did not abide by this mandate.  To
begin with, the district court committed an obvious and
critical error by assuming that the settlement was valued at
$1.16 million when in fact it was worth no more than

$950,000.  *See* Opin. at 11 (referring to this as a "glaring
error . . . apparent on [the settlement's] face").  Because of
the $1,000 cap on per-claimant out-of-pocket expenses, the
176 claimants who sought $384,134.77 are entitled, at most,
to $176,000.  Yet the district court relied on a patently
incorrect valuation of the settlement in determining whether
the attorney's fees were disproportionate to the settlement's
benefit to the class.  This error is starker still because, as
recounted above, the district court's chief concern at the
settlement approval hearings was the size of the settlement
vis-à-vis the attorney's fees award.  It cannot be inferred that
the district court "explored comprehensively all factors,"
*Allen*, 787 F.3d at 1223–24 (simplified), when the district
court—contrary to its asserted concern—failed to notice an
obvious issue with the valuation of the settlement and thus
failed to notice that the attorney's fees are equivalent to 84%
of the final settlement's benefit to the class.  *See Kim*, 8 F.4th
at 1180 (reversing the district court in part for relying on an
"inflated settlement value" in approving a class action
settlement).

Moreover, the record is bereft of any discussion of Rule
23(e)'s factors and many of the *Kirsten* Plaintiffs' detailed
objections.  In particular, the district court did not respond to
the *Kirsten* Plaintiffs' objection to the settlement's clear-
sailing provision.  "[W]hen confronted with a clear sailing
provision"—particularly when the fee request is large vis-à-
vis the benefits to the class—"the district court ha[d] a
heightened duty to peer into the provision and scrutinize
closely the relationship between attorney's fees and benefit
to the class." *In re Bluetooth*, 654 F.3d at 948.  The district
court, as I have explained, failed to do this.  Moreover, the
district court nowhere addressed the *Kirsten* Plaintiffs'
objections that the Settling Plaintiffs had engaged in no

motions practice or formal discovery, that the *Kirsten* Plaintiffs had been excluded from consolidation and settlement talks, that the settlement's release clause was arguably overbroad, and that the methods by which the Settling Plaintiffs and the claims administrator reached out to potential class members were assertedly inadequate. At best, the district court acknowledged that it had heard these objections. "In the pre-certification context," however, "the district court must do more than acknowledge that warning-sign provisions exist and then conclude that they are not dispositive without further apparent scrutiny." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 611 (9th Cir. 2021). The district court's silence on the record and in its orders was in direct contravention of our precedent.

Furthermore, what little the district court did state on the record was internally contradictory, making the court's reasoning all the more confounding and opaque. At the preliminary approval hearing, the district court expressed considerable concern about the potential that the settlement's value would end up being much less than $3 million, particularly given that the claims-made nature of the settlement arguably rendered it "reversionary" in nature. In one of its few substantive comments, the court explained that in "incentiviz[ing]" the Settling Plaintiffs' counsel "to get as much money for this class" during the claims process, the court sought to address its discomfort about "not knowing the amount of the claims" that would ultimately be made. Yet, at the final hearing, the district court heard that the settlement's final value was no more than $1.16 million, with a claims rate of less than two percent, and that therefore the court's hope that the Settling Plaintiffs' counsel would achieve the previously hypothesized claims rate had failed. Nonetheless, the district court approved the settlement. The

district court never explained in its written orders or on the record why it did so, in spite of its prior stated concerns about the claims-made nature of the settlement and the possibility of a low claims rate.

This failure to properly address the low claims rate was independently an abuse of discretion. In *Allen*, we vacated and remanded a settlement because, after "class counsel said that he would consider it a success if even 10% or 15% of the class made claims," the actual "claims rate was less than 8%," and "the record g[ave] no assurance" that the district court made any further inquiry, in light of that development, "into why the parties had negotiated such a disproportionate distribution between fees and relief." 787 F.3d at 1224 n.4. (simplified). Likewise, in *Roes, 1–2*, we held that, "in light of the" low claims rate of a settlement with reversionary features, the district court "should have done more to investigate whether [the settlement] was really worth \$1 million and was not unfairly inflating attorneys' fees." 944 F.3d at 1054–55. The low claims rate here should have caused the district court to investigate further and make clear findings, not resort to a perfunctory order.

Finally, the narrow gap between the maximum value of the settlement and the attorney's fees award "ma[de] it all the more important for the district court to closely examine the claimed value of the non-cash portions of the settlement that were used to justify the requested attorneys' fees." *Roes, 1–2*, 944 F.3d at 1051. While the district court asked questions about the two-year credit monitoring program, it never made a finding attaching a monetary value to the program. Again, we have previously reversed district courts for precisely this reason. *See*, *e.g.*, *Kim*, 8 F.4th at 1179 (reversing a settlement approval because we discerned "no basis for [the district court's]" decision to "accept[] class

counsel's unsupported representation" of the settlement's injunctive relief's worth); *Allen*, 787 F.3d at 1225 (reversing a district court after it "did not make express findings about the value of the injunctive relief").

The foregoing errors plainly demonstrate that the district court failed to apply heightened scrutiny to the settlement and therefore abused its discretion in approving the settlement. The settlement should be vacated, and this matter remanded to the district court so that it can engage in "a more searching inquiry," *Roes 1–2*, 944 F.3d at 1050 (citation omitted), and provide a "clear explanation of why the disproportionate fee is justified" and why this settlement was not the result of collusion, *In re Bluetooth*, 654 F.3d at 949.

**B**

The majority agrees with much of what I have said. Specifically, the majority agrees that the district court had a "heightened obligation to ferret out any evidence of collusion or other conflicts of interest" in the negotiation of the settlement. *See* Opin. at 19 (simplified). The majority also agrees that the settlement here "raises all three red flags of potential collusion under *Bluetooth*," *see* Opin. at 17 (citation omitted), and that the district court missed at least "one glaring error . . . apparent on [the] face" of the settlement, *see* Opin. at 11. Further, the majority agrees that, despite these red flags and the district court's heightened obligation, "the district court's preliminary and final approval orders were sparse—almost boilerplate—and memorialized little of the district court's rationale," *see* Opin. at 16, and that it is impossible to "infer the district court's rationale for its fee award from the record," even though the court "approv[ed] fees that appear excessive of

[the] settlement['s] value," *see* Opin. at 24. The majority nonetheless upholds the approval of the settlement, but its reasons for doing so are flawed.

The majority contends that it "can reasonably infer the district court's rationale from the record," *see* Opin. at 16, and that "the district court gave the settlement provisions a hard look under the *Bluetooth* factors," *see* Opin. at 20. But this conclusory assertion lacks support in the record. The district court expressly addressed only one of the *Bluetooth* factors—the disparity between the size of the settlement and the attorney's fees—and even then, it missed what even the majority refers to as a "glaring error" concerning the settlement's final value. There is thus no evidence in the record that the district court gave a proper hard look at *any* of the *Bluetooth* factors. Moreover, the district court's rationale cannot be "reasonably" inferred when the district court initially expressed "tremendous concern" about the settlement's fee provisions if the settlement's final value fell below $2.5 million and then, in an unexplained about-face, approved the fees award and reaffirmed the settlement approval even though the settlement's final value fell to less than $1.2 million (and, in reality, $950,000). And nowhere does the record show why the district court rejected the *Kirsten* Plaintiffs' remaining objections. The majority is simply wrong in concluding that the record here provides a sufficient basis for affirming the district court.[6]

---

[6] The majority's apparent reliance on the fact that the district court questioned the mediator is also contrary to our precedent. As we explained in *In re Bluetooth*, "the mere presence of a neutral mediator . . . is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement. . . . [T]he Rule 23(e)

The majority cites two pre-2000 cases for the proposition
that, in some instances, a district court's issuance of a
conclusory order will not be reversible, but these cases lend
no help to the majority here. *See* Opin. at 16 (first citing
*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir.
1998), *overruled on other grounds by Wal-Mart Stores, Inc.
v. Dukes*, 564 U.S. 338 (2011), and then citing *In re Pac.
Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995)). As an
initial matter, the majority misreads *Hanlon*. The "almost
conclusory" findings that were upheld in *Hanlon* exclusively
concerned "the requirements of Rule 23(a) and 23(b)(3),"
and *not* "the 'fair, adequate and reasonable' preconditions for
class settlement pursuant to Fed. R. Civ. P. 23(e)." 150 F.3d
at 1023–24. Indeed, *Hanlon* explicitly adopted "a more
probing inquiry" standard for pre-class certification
settlements pursuant to Rule 23(e). *Id.* at 1026–27. And in
explaining why the Rule 23(e) standards were met, *Hanlon*
did not say that the district court's comments were
conclusory; on the contrary, it discussed the district court's
multiple stated reasons at some length. *Id*. at 1027. By
misciting *Hanlon*, the majority does exactly what *Hanlon*
made clear that courts should not do, which is "conflat[e]"
the requirements of Rule 23(a) and (b) with those of Rule
23(e) and thereby water down the latter. *Id.* at 1023–24. In
any event, we explicitly noted in *Hanlon* that "[n]o evidence
of collusion was presented to the district court or otherwise
evident in the record." *Id.* at 1027. As the majority
concedes, the record of this case is replete with such
evidence. *See* Opin. at 17–18. Finally, the majority's
reliance on *In re Pacific Enterprises* is similarly unavailing.

---

reasonableness inquiry is designed precisely to capture instances of
unfairness not apparent on the face of the negotiations." 654 F.3d at 948;
*see also Roes, 1–2*, 944 F.3d at 1050 n.13 (similar).

In that case, we explicitly noted that the district court "responded to . . . objections and explained why the derivative settlement [was] fair." 47 F.3d at 377. Here, the district court did neither.

At bottom, the majority's error stems from its unfounded belief that merely "prob[ing]" and "question[ing]," *see* Opin. at 20, the parties and a mediator at a hearing is a substitute for judicial reasoning and the careful exercise of judgment. But we have said otherwise. We have held that Rule 23(e), our precedent, and due process demand an "inquiry, findings, *and* evaluation of whether the settlement is fair, reasonable, and adequate." *Allen*, 787 F.3d at 1225 (emphasis added). By ruling as it does today, the majority flouts all three, just as the court below did.

\*     \*     \*

I respectfully dissent.